Your Honor. Morning. May it please the Court. Is there enough light there? I do, Your Honor. I'm fine. Alright. Thank you. Not all the lights are on, though. Not all the lights are on. Don't we have any more lights? I think it needs a bulb. I mean, if it's dim like this, the audience is going to fall asleep. They might anyway. Okay. Thank you, Your Honor. May it please the Court. Ken Miller on behalf of Mr. Sanchez. The first issue that I would like to address is the severance issue. The what issue? The severance issue, Your Honor. Okay. And the standard for the severance is whether or not the co-defendants defense, Macias and Calderon, whether their acquittal depended on convicting Mr. Sanchez. And I submit that it did, and I submit that both counsel for Calderon and Macias admitted that it did. Counsel for Calderon said it after trial, that this was a bloodbath, that after Mr. Sanchez decided to testify the way he did and implicate Macias and Calderon, it was his job to convince the jury that Mr. Sanchez was guilty. You know, there's one question that I got to ask you in the first place. The two co-defendants raised the other side of the coin and said that it should have been severed because of the position taken by Sanchez, who said, they're the guilty ones, not me. We were all in this conspiracy together, but I was in track. But these are the guys who really did it. And, of course, that interfered with their position that they didn't have anything to do with this conspiracy. And this court, in an unpublished opinion, said that that was not a reversible error. And aren't we bound? No, Your Honor. Why not? Because as I stated in my 28J letter, the unpublished opinion as to Sanchez is dicta. The test for both defendants is different. For Calderon and Macias, they had to prove that for Sanchez to win, he had to convict them. And the Court said, no, he didn't have to convict them. In fact, the Court actually went broader than that. But to the extent that the Court went broader, it was dicta, and it is not law of the case. The issue in this case is whether or not Macias and Calderon had to convict Mr. Sanchez. And both counsel admitted they did. And the explanation for why they felt that way was given by Macias' attorney, Diane Bass, in closing arguments. She said, she, meaning Jeannie Joseph, the prosecutor, can't have it both ways. Either he is telling the truth or he is lying. If Mr. Sanchez was telling the truth, their client gets convicted. If he is lying, their client gets acquitted. So their acquittal depended on Mr. Sanchez's conviction, and both counsel admitted that. And then they went after Mr. Sanchez. Isn't it, don't we look at what the core of the defense theories were? Yes. And the core of your client's theory was that he was entrapped. Yes. By the confidential informant. Couldn't he prove that theory without necessarily implicating the others? Yes. And couldn't they prove their innocence or non-involvement, which I guess is what they were trying to prove, without necessarily demonstrating that Mr. Sanchez was not entrapped? No. Why? Because, for the same reason in Romanello, unless they convict Mr. Sanchez, they are going down. They both understood that, and that's why they went to such great lengths to do it. Why couldn't Mr. Sanchez prove his entrapment, that he was entrapped, which is, you know, an affirmative defense, without necessarily, and they could prove their own defense, which was non-involvement? I don't believe they could prove their own defense without convicting Mr. Sanchez. And I don't believe that they could prove their own defense without convicting Mr. Sanchez. You think convicting, but we're really looking at what their defense theory was. I disagree, Your Honor. I think you actually have to look at the facts and what actually happened. And you have to look at how the – and that's why the law of the case does not apply. You have to look at how did Mr. Sanchez's attorney, Philip Deitch, go after those  guys? He didn't really have to go after them, because his theory was really entrapment. But those guys really had to go after Mr. Sanchez, and they did. Because they knew that what the prosecutor was trying to say was, well, you can believe them, you can believe Mr. Sanchez when he says that he actually did it, and they were involved, but you can't believe him when he says that he was entrapped. Those defendants – Yes. It's just that you did it at the inducement of the government. Correct. Right. So he wasn't denying that he participated in the deal. Absolutely not. Absolutely not. But, Your Honor, the facts on the ground were that Macias' counsel and Calderon's counsel, they're experienced defense attorneys. They knew they had to convict him. Otherwise, they had no chance. And they both have explained this on the record. Macias' – Diane Bass, Macias' counsel, explained it while she was giving closing argument. And, again, Mr. Calderon's counsel, Tom McDonald, explained it subsequent to trial. But – and this case, I believe, is on all fours with Romanello, which I believe is still good law. And I would just take this opportunity to point out what I didn't point out in my briefs, which was in the Zafiro case, the Supreme Court cited Romanello. And it didn't indicate in any way that that opinion had been undermined. But what was their defense, again? Their defense was basically mere presence. They were just – they were there at the McDonald's while a drug deal was going down, and they did not know that a drug deal was going down. Why did they have to convict Sanchez? They had to convict Mr. Sanchez because Mr. Sanchez was saying, I got the drugs from them. I was entrapped, but I got the drugs from them. They understood that unless they made Mr. Sanchez out to be a complete liar, unless they made him out to be guilty, their clients were going down, because the jury – if the jury believed anything Mr. Sanchez said, they were getting convicted. And the case then becomes analogous to Romanello. But if I could just even move a little bit forward. Well, the jury didn't believe Sanchez. No, the jury did not believe Sanchez. But there's a couple things going on here. One is there was all sorts of improper argument that were being made against him that kind of pushed me to the second part of my severance argument. When you look at Zaffiro, really what the Supreme Court was concerned about – yes, Your Honor. Let me ask you a question. Yes. How many reported Ninth Circuit cases are there where there's a reversal on the basis of failure to sever? I'm not sure how many. I'm aware of at least one being the Mayfield case. I know there's another one that I believe is cited in my briefs, and I apologize for not being able to give, Your Honor. I just can't go farther than that because I'm not certain. I still have to go back to my original question. Well, I think there's one. Okay. Mayfield. That's when I was reversed. There aren't very many, but I want to quote you from Dean V. Transworld Airlines. It's a Ninth Circuit case in 1991. The law of the case has been applied when the appeal of one co-defendant is decided prior to the appeal of the other co-defendant if both were convicted at the same trial. Now, I know what you're saying. This was an unpublished opinion. But whether it's an unpublished opinion or not doesn't, to me, indicate that it's absolved from the law of the case, doctor. If your client had some other appeal, say one was taken by the prosecution and there was a determination and it was unpublished, it would still be the law of the case as far as your client is concerned. And I'm suggesting that when co-conspirators are involved, if one co-conspirator raises the same issue of severance and it loses, I don't see how we can decide that issue in your favor. Two ways, Your Honor. First is I submit, it's not that the prior opinion was unpublished. I don't have any problem with that. It's that that portion is dicta as it relates to Mr. Sanchez because I believe that each co-defendant has separate rights and so the test is applied differently as to each one. Further, for Mr. Sanchez, there is the big problem that all sorts of inadmissible evidence and argument were raised against him, and that argument only applies to him, and that could not have been taken care of in the earlier opinion. For example, defense counsel in the case of Sanchez. In other words, you think that there's a separate issue that wasn't decided. Yes, Your Honor. And that the law of the case doesn't apply because your position is markedly different from the other co-conspirators who had a different theory. Yes, Your Honor. Yes. And I see that I'm out of time. If I could just summarize my second argument. Actually, I'm interested in your second argument. Oh, thank you. I want to know what's, did the district court apply the correct standard in determining? No. She did not. The district court applied the general new trial rule that, for newly discovered evidence. But we were talking about perjury of an informant in this case. And when you're dealing with perjury of an informant, there's a different prejudice standard and there's no due diligence requirement that's applied. The two prejudice standards are, was this perjurious testimony or false testimony, the admission of it, harmless beyond a reasonable doubt, if it was knowingly  used. If it was unknowingly used or accidentally used, then the standard is, does it undermine the reliability of the jury's verdict? Essentially, the Brady standard. The standard that the district court applied was, is it more likely than not you will win on retrial? So the district court applied the wrong standard. More, but the most, that's a fundamental problem. But the most fundamental problem with the district court's treatment of the new trial rule is that the district court's treatment of Eric Silva's proffered testimony as cumulative and merely impeaching. The courts, the Supreme Court, the jury instructions, everything makes it very clear that when you're talking about predisposition, the time that matters is before the defendant meets the informant. Eric Silva's testimony went to that very first meeting. You can compare Sanchez's testimony with Eric Silva's proffered testimony. It is clear they are talking about that very first meeting. And what is the conflict? What shows, demonstrates the perjury? What shows and demonstrates the perjury is, one, Silva says, yes, we were there. Fiero sold us drugs. Not Sanchez asked if he could buy drugs. So that's the first perjury. The informant sold drugs to the defendant, not vice versa at the first meeting. Second, the informant actually did drugs with the defendant at that meeting. Those are actually the two main things. And one of those is actually a factor that the Ninth Circuit cites in Tucker as something that you have to look at to determine predisposition. And that is, who came up with the idea of the illegal conduct? According to Fiero, the informant, Sanchez at this first meeting said, let's, you know, I would like to sell you a lot of drugs. According to both Sanchez and now Silva at that first meeting, Fiero sold them drugs, and that issue never came up. Absolutely huge. Now, you may say I don't believe that evidence, even though it's been disregarded without an evidentiary hearing. But to call it cumulative and to call it merely impeaching is to completely mischaracterize it. But if you didn't have these other two people and the trial only involved your client, what would your argument have been? He admitted that he was there and he was involved with these drugs, so he had this entrapment defense. It would have been entrapment and he would have had support. I have to be clear. So what was the entrapment argument? Oh, the entrapment argument was that first this guy, Fiero, sold him that an eight ball of cocaine or methamphetamine at that very first meeting, and then they started meeting every day after that, and Fiero would give him another eight ball, another eight ball, until he built up a $600 debt when Fiero said, okay, now you have to set up a drug deal to pay me back or else. That was the inducement. The whole setup was between Fiero and the policeman, correct? It was between Fiero and Sanchez, between my client Sanchez and Fiero, the informant. By Fiero, he was acting as an informant. Yes. And he is not a one-time informant. He'd been an informant over several times. Yes, Your Honor. According to this testimony. Yes. And the real, what you're really saying is we would have had a very much stronger case of entrapment. It did go to the jury, didn't it? It did. We'd had a much better entrapment case if the jury knew that this guy, Fiero, was also a drug addict like the rest of them were and had been involved in using drugs. And that would have made him much less, it would have put the plaintiff's, I'm sorry, the defendant's position of entrapment in a much better light. Absolutely, and it even went further. Why couldn't you have brought that up? I did in a new trial motion. Nobody could get Fiero, I mean, nobody could get this guy, Eric Silva, prior to trial. Now, what kind of due diligence and efforts were made by the defense to get his testimony? Well, what eventually happened, Phil Deitch, who was retained, went to Judge Stotler and got approval for funds, applied for investigative funds, and I believe it was for the three weeks prior to trial, went out and tried to get Silva every day. And what would happen was Silva would say, Silva's family would say, well, meet him at this place at this time, and Silva would never show up. And this went on all the way up until the first time of trial when the investigator decided and defense counsel decided he's ducking us, he's just not going to show up. Now, are you contending that the prosecution knew, in your theory, if we credit Silva's testimony about the first meeting, that would mean that Fiero lied. Are you contending that the government knew about that? Yes. I don't think it's essential to my argument, because even under unknowing perjury, I get a better standard of review, so the judge abused her discretion. But I need to know. I want an evidentiary hearing to develop the record of how much they knew about what this guy was up to when he was out trolling. Well, what evidence do you have that the government was aware? Well, the ‑‑ really, it's the fact that he was a longtime ‑‑ the first piece of evidence is to hold the government responsible for his knowledge, to say that he is an employee of the government. Excuse me, Your Honor, I'm sorry. Straighten out the names. Oh, yes, I apologize. When I'm talking about Elias Fiero, the first position that I take is that Elias Fiero knew he was lying. He is a longtime government informant, a longtime paid government informant who works at the direction of the Bureau of Narcotics Enforcement. Therefore, his knowledge is sufficient to hold the government accountable for knowing presentation of perjury testimony. The second thing ‑‑ How does that work? Well, that would just say that he was an employee. He was essentially an employee of the government, and the government is going to be ‑‑ you know, you make deals with the devil and you've got to be responsible for the sulfuric smell that comes up. Basically, when they use somebody like him, they're responsible for all his baggage. When they use him, when they pay him. Did you cross‑examine him on that? No, nobody ‑‑ no, we didn't have the evidence that he had lied. They tried to cross‑examine him on whether or not he had been using drugs or whether or not he set up Sanchez. But there was no independent corroboration for it. So ‑‑ What would you have needed for that? We would have needed Eric Silva. We've got Eric Silva now. And we need ‑‑ Now, where was Eric Silva? Eric Silva was unavailable. He was ducking these guys. Who was he working for? Eric Silva wasn't working for anybody. He was ‑‑ he's an independent witness in this case. He's a third‑party witness who originally introduced Sanchez, my client, to the government informant, Elias Fierro, when they all did drugs together and Fierro sold them drugs. So he's an independent witness out there. Well, did you get a subpoena? That we had ‑‑ I wasn't the attorney. Did you get a subpoena? They could not subpoena. That would ask the marshal to go out and find him? If your private investigator isn't going to find him, I don't believe that asking the marshal to do it. Well, I don't know that. I don't know that. I mean, you know, sometimes these private investigators are good and sometimes they're not. That's true. But, you know, if you had a subpoena, you could send the marshal out there. Right. And the judge could say, could inform the marshal service, I want this person in here. Right. And they'd find him. They would find him in there. Yeah. The FBI would find him. I think the actual ‑‑ The DEA would find him. I think you could do a material witness warrant would actually be the process. So you'd say, I want you to go out and arrest my witness. And you want your witness to testify to something that is against his penal interest. So he is going to be incarcerated. He's going to have an attorney appointed for him. He is never going to testify to these facts. Number one. Number two, just because you ‑‑ What makes you think he would testify to those facts if you found him? Because I have found him and I've got his report. And he's basically saying all these things. Well, we've got him. At least, you know, we had him for the evidentiary hearing that never actually took place. Well, you have an interview of him now. Yes, Your Honor. Right. And so you found him and he talked about this particular meeting. Yes. And did he indicate willingness to testify? Yes. And he was present at the evidentiary hearing to testify. And the transcripts are in the record. And I had ‑‑ when Judge Stotler took the issue under advisement and said we are going to decide whether or not we have an evidentiary hearing and ordered him to come back at the evidentiary hearing. You know, we set a date and she ordered him to come back. So that was the extent that we had control over him at that time. And then what happened? She denied the evidentiary hearing? She denied the evidentiary hearing and we took an appeal. And she said you could have found him beforehand, right? She said that we ‑‑ she said he was demonstrably hard to find but that we didn't exercise due diligence. And I just found that puzzling because let me make my second point about the marshals. And that is just because you send them out doesn't mean that they're going to find him. I mean, they're not as motivated as the defense counsel and the defense investigator in this situation. So I don't think having a blanket rule that you haven't shown due diligence until you try to bring the marshals into it works. And I don't think asking for ‑‑ You could show anything more? No. Absolutely. I think I could. I think I could put Eric Silva on the stand and hopefully I could also get some discovery about Elias Fierro and prior complaints about him. There's another gentleman that ‑‑ You've answered it. You're way over your time. Okay. Thank you all very much. Unless there's any further questions, I am ‑‑ Way over your time. Okay. Thank you. We'll take it off to your next argument. May it please the Court, Ilana Arsen on behalf of the United States. And I'd like to ‑‑ I don't know if that's an amplifier or not. But if it is, put up the microphone a little bit. Is it an amplifier? Are you able to hear me better now, Your Honor? Well, just speak up a little bit. You're doing okay. Like you're talking to the wall back here. Yeah, right. I'd like to begin with the last issue that was discussed, which was with respect to the new trial motion, whether there was due diligence in finding this witness, Eric Silva, before trial and what the record reflects as to that. Did the government know about Silva before trial? Well ‑‑ Just answer that yes or no. Did you know about Silva before trial? I don't know whether the government had interviewed Silva, but the government ‑‑ Did they know about him? Yes, because Fierro ‑‑ Did they know where he was? I am not sure the government knew where he was, but the record shows that the defendant knew where he was because the defendant interviewed him and the witness said, I don't know Sanchez, and apparently they didn't call him. But what the record here shows is that, in fact, there was an effort made before trial. Had the government used him before on any matters? This witness that's hard to find, Silva? No, he was not a government witness. He was a defense witness. But what the evidence showed with respect to the lack of ‑‑ But the government had any prior experience with him. With Mr. Silva? Yeah. Not that I'm aware of, Your Honor. But what the record here shows is that the defense applied for investigative funds. This is at ER 887 to 90. The defense applied for investigative funds, saying we've located this witness, Silva, and we want to interview him. The district court granted funds. The investigator went out on January 15th, which was five days before trial, to interview Silva. He's in the jail. He says, I'm the wrong guy. I don't know anything about Rene Sanchez. In fact, I would submit, Your Honor, that it was not the wrong guy. The record here shows that it was the right guy. Silva was in jail. Yes, because if you compare the booking information for his jail stay, which is at ER 90, and you compare the Westminster Police Department's arrest report that occurred on the night of this transaction, May 9th, 2002, which is at ER 908, you've got the same name, Eric Anthony Silva. You've got the same date of birth. You've got the same identifying information. I would submit that they found the witness, and he simply didn't want to testify. Now, a year and a half later, by the time the new trial motion came around, perhaps he was willing to testify. Well, isn't that important? Suppose it was a witness that you had, and the witness didn't want to say anything. He's in jail. He doesn't want to make his situation worse. Later on, after he's sentenced and he can't make anything worse, he comes forth with the truth. Isn't that newly discovered evidence? Well, Your Honor, first of all, I would submit under this court's law in Kulzik, it is not newly discovered evidence. If the district ---- There's a problem with our court's law. We've applied different tests and done it inconsistently. We have used Kulzik sometimes, and then we've also used a different test sometimes when perjured testimony is the allegation. And they're very different tests. I mean, the young, I guess young, Endicott line, Killiam, just requires that our confidence is undermined in the verdict. The other one is a harder test to meet, the Kulzik. That is true, Your Honor. We have lines of cases that go, that decide the same issue under two different tests, one more favorable to the defendant, one not. Judge Stotler chose the Kulzik line. Your Honor, it is true that there is ---- It may not be right. It may not be right that she chose that line. It is true that there is a different test when perjured testimony is used. However, there is no evidence that there was perjured testimony here. What there was was inconsistency. And this Court's case law is very consistent in cases like Shurnock and Zuno Arce that simply having inconsistent testimony between two witnesses does not bring into play that Mooney-Napu test. In this case, the inconsistency is such that one of the two of them is lying, which means one of the two of them committed perjury or would commit perjury. If you had an evidentiary hearing and Silva came in and he said what he says in these interview statements, then either he's lying or the confidential informant's lying, which means one of them's perjuring themselves. So how do you get around that? Well, two ways, Your Honor. First of all, I would submit that that's not the way that the evidentiary hearing works. It's not the Court's job to decide how would the jury credit one or the other witness. It's the jury's job to decide that. It's the Court's job to decide whether the jury is entitled to hear that. The jury never heard this. But the ultimate question is, does this undermine confidence in the fact that the defendant was not entrapped? And Judge Stotler correctly ruled that it did not because there was overwhelming evidence in this case that the defendant was predisposed. Using the wrong standard. That is, even under the Mooney-Napu standard, Your Honor, the question is still basically a Brady standard. Does it undermine confidence in the jury's conclusion that the defendant was not entrapped? And on the facts we have here, there was overwhelming evidence that the defendant was predisposed because we have him on tape enthusiastically negotiating this deal, discussing drug lingo, discussing prices, discussing quantities, negotiating the location. We have phone calls showing that in the week before, this defendant made numerous calls to Fierro with very few calls in return. On many occasions when the defendant called Fierro, immediately after that there's a call from the defendant to Mr. Calderon, who was a co-conspirator. We also have the fact that this defendant had two prior convictions for possession for sale of narcotics. Well, maybe he learned his lesson. I know you say that the prior convictions indicate he wasn't entrapped. Well, I don't think that's necessary. Couldn't you say the prior conviction shows that if you do this, you're going to go to jail and therefore it's the contrary. It shows the contrary, that he wouldn't have done it unless somebody made it readily necessary for him to be involved. And he was a drug addict. Keep that in mind. They're all a bunch of addicts here, except maybe the informant. I'm not sure about him. And the informant did testify that he had used drugs, and he did testify that he had used drugs while he was cooperating with the BNE. So that testimony was already before the jury. But he only said once. Correct. He said, I only used drugs once. Correct. And what the defense is trying to show is that he used drugs many, many, many times. And therefore, he was really a paid informant, and he would be the one likely to have set this up rather than the defendant. But, again, with respect to the manner in which an entrapment defense is usually disproved, it is usually disproved through the tapes because the most important factor is whether the defendant expressed reluctance. And in the tapes we have here, reluctance. Or reluctance. And in the tapes and in the phone calls, it is clear that the defendant here did not express any reluctance. Not only was he enthusiastically negotiating the deal, but on the tapes he even refers to the fact that it will be better next time, meaning that when we finish this deal, if all goes well, next time there will be a better price or the quality will be better or something of that sort. That is classically the type of evidence that disproves an entrapment defense because it shows that the defendant is overwhelmingly predisposed. I would also point out that with the ---- Let me ask you this. Had the government ever interviewed Silva? Your Honor, I was not trial counsel, and I don't know the answer to that question, but I ---- Well, you know. You're supposed to know everything that went on. And I apologize that I don't, but I will find out, and I will report back to the court. Well, Silva was in jail, so presumably the government knew where he was and could have talked to him. Your Honor, I honestly don't know if the government interviewed Silva or not, and I will go back and I will ask trial counsel, and I will find out for the court. That would have been, if they had, that would have been required to be produced to the defense, right? I would agree that if there were Brady material, then that would be required to be produced. So if there was information that the government obtained that Silva had somehow provided some negative impeachment information, yes, we would agree that that would have to be disclosed. Whether the government had interviewed Silva, I don't know. If I could just take a couple of minutes to turn to the issue of severance and, again, respond to Judge Pragerson's question about cases where this court has reversed on the ground of severance. I'm aware of three cases where there have been reversals. There was Mayfield, there was Tudyk, and there was Sherlock, which are all cases that we've cited. And in all of those cases, there truly were antagonistic, mutually exclusive defenses. And I would submit that a prior panel of this Court has already determined, and it is the law of the case, that these were not mutually exclusive defenses. Now, that does not completely resolve the question of whether this defendant was prejudiced. But given that he can't even get to the first step of saying these were mutually exclusive defenses, we would submit that there was no prejudice here of the type that was identified in Zafiro. There was not a denial of a specific trial right, nor is this a situation where the jury was prevented from making a reliable judgment about guilt or innocence because the defenses were not mutually exclusive and they could have acquitted all three defendants. I see that my time has expired, so the Court has no further questions. I will find out the answer to the Court's question, and I will report back. Thank you. You can find it out rather quickly, can't you? Is that right? You ought to be able to find it out quickly. I will call trial counsel as soon as I complete my argument here and see how quickly I can get the answer for you. Who was in trial counsel? Trial counsel was Jeannie Joseph, and I believe that she is in trial today. But I will try to reach her as soon as I can and find out the answer to the question. Thank you. And you could just fax us a letter. Will do, Your Honor. Thank you. Thank you very much. I assume my time is up since it went so far over the first time. Yeah, you're making correct assumptions. Thank you, Your Honor. All right, thank you. The matter will stand submitted. Now we come to the United States v. Caceres.
judges: Pregerson, Wardlaw, Bright